UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**KIARA GIVHAN**,     Case Number 1:13 CV 611

    Plaintiff,     Judge Dan Aaron Polster

    v.     REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.     Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Kiara Givhan filed a Complaint against Defendant Commissioner of Social Security's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 1385(c). On July 2, 2013, Defendant moved to voluntarily remand the case under the sixth sentence of 42 U.S.C. § 405(g) due to an inability to locate a complete claim file. (Doc.13). This motion was granted (Doc. 15), however the case was subsequently reopened after the claim filed was located (Doc. 16), (Non-document entry dated May 29, 2014). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated May 29, 2014). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff applied for and received disability benefits as a child. (Tr. 51). Upon her eighteenth birthday, Plaintiff was reassessed to determine if she met the definition of disability for adults. (Tr. 51). Plaintiff's claims were denied initially (Tr. 51-53) and on reconsideration

(Tr. 55). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 66). On December 9, 2010, Plaintiff (represented by counsel), a vocational expert ("VE"), and Plaintiff's mother testified at a hearing after which the ALJ found Plaintiff not disabled. (Tr. 16-29; 380-413). On August 31, 2012, the Appeals Council remanded the case for a new hearing after the record upon which the ALJ's decision was based could not be located. (Tr. 14-15). On December 5, 2012, the Appeals Council vacated this decision after the claim file was located. (Tr. 11-12). On February 19, 2013, the Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 5-7); 20 C.F.R. §§ 416.1455, 416.1481. On March 21, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

*Personal and Vocational Background*

Born August 27, 1989, Plaintiff was 21 years old at the time of the hearing before the ALJ. (Tr. 48, 380). She had completed the ninth grade and lived with her mother, sister, and son. (Tr. 122, 387, 390). During the hearing, she did not want to testify without her mother in the room. (Tr. 386). Plaintiff testified she was able to bathe herself but her mother had to help her get dressed. (Tr. 389). Plaintiff reported that she cleaned her room and ironed clothes once a week but these tasks took her all day. (Tr. 125). She said she was able to sweep the floor and help with laundry but she could not do it all by herself because she would be too sore. (Tr. 392-93). She testified she lay in bed all day and her mother left food for her to prepare in the microwave. (Tr. 397-98). Earlier, she reported she watched television, read, and listened to music on a daily basis. (Tr. 126). She also was able to help care for her son who was in kindergarten but testified that her mother was the primary caregiver. (Tr. 397). Plaintiff said her mother paid her bills and she did not use a checkbook. (Tr. 126).

2

She testified her legs hurt all the time and she had fibromyalgia. (Tr. 390). She said she took medication for fibromyalgia as well as seizures. (Tr. 393).  Plaintiff said this medication only helped "a little bit" because it made her fall asleep and she would still have headaches all the time. (Tr. 394). Plaintiff also said she felt depressed all the time and did not know why. (Tr. 395).

As far as treatment, Plaintiff testified she saw Deepak Raheja, M.D., every two weeks and she was going to ask to see a counselor. (Tr. 396). She said she saw another doctor as well, for fibromyalgia and epilepsy, but she could not remember his name. (Tr. 396).

Plaintiff's mother also testified at the hearing. (Tr. 400). She said Plaintiff's testimony was fairly accurate and that during the day Plaintiff mostly made food, would straighten up, and put clothes in a bag to drag downstairs to the basement to do laundry. (Tr. 401). Plaintiff's mother also testified Plaintiff would try and help her son with his homework which involved things like learning his ABC's, colors, shapes, and his name. (Tr. 401).

*Medical Evidence*

On January 17, 2007, Plaintiff underwent a consultative examination with Sally Felker, Ph.D. (Tr. 154-59). Plaintiff arrived on-time for her appointment accompanied by her mother and two-year-old son. (Tr. 154). On examination, Plaintiff was casually dressed with her hair in an unusual style, although it was apparent she took considerable care in doing it. (Tr. 155). Plaintiff was cooperative and did not display any problems with impulsivity. (Tr. 155). Her speech was at a normal rate, organized and goal directed. (Tr. 155). However, she reported being depressed and having problems with irritability. (Tr. 155). Plaintiff was oriented and had a fair attention span and ability to concentrate. (Tr. 156). Her judgment and insight were also fair but she gave the

3

impression of not yet being able to manage independently[1]. (Tr. 156). In terms of activities of daily living, Plaintiff reported she got up and showered, dressed, and took her medication and then spent the day looking after her son. (Tr. 156). Plaintiff indicated she fixed breakfast for herself and her son, did dishes and laundry, and looked-up information on her sister's computer. (Tr. 155).

IQ testing revealed Plaintiff had a Full Scale IQ of 69, a Verbal IQ of 77, and a Performance IQ of 64. (Tr. 156, 158). Dr. Felker noted that on some portions of the test, Plaintiff appeared not to be putting forth optimal effort, particularly on the timed performance section, where "she seemed to be working very slowly almost unnecessarily so." (Tr. 156). Dr. Felker diagnosed borderline intellectual functioning and assigned a Global Assessment of Functioning ("GAF") score of 57[2]. (Tr. 157).

Plaintiff regularly treated with Dr. Raheja, a neurologist, for seizures, low back pain, and depression. (Tr. 221-25, 284-85, 373). At an appointment in October 2007, she reported having two seizures a week. (Tr. 225). Dr. Raheja indicated Plaintiff had been non-compliant with her seizure medication. (Tr. 225). On examination, Plaintiff had appropriate mood and affect, her cognitive functions were preserved, and she had fluent speech. (Tr. 225). She had tenderness to palpation in the lower lumbar region; however, diagnostic testing showed only "[m]ild lower lumbar degenerative changes" with no canal or foraminal stenosis and no cord impingement. (Tr. 224). Plaintiff continued to see Dr. Raheja through 2010 for her seizures. (Tr. 221, 284-85, 373).

---

1. The Court notes that Plaintiff was seventeen-years-old at the time of this examination.
2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.* at 34.

On February 25, 2008, state agency physician Paul Morton, M.D., reviewed the evidence in connection with the agency's redetermination of disability. (Tr. 181-89). He explained Plaintiff had a seizure disorder but had not had seizures within the past year, had a history of backaches, and no evidence of any bleeding disorder or of any severity relative to headaches or sinusitis. (Tr. 181). Dr. Morton opined that Plaintiff did not have any exertional limitations. (Tr. 183). However, she could frequently climb ramps or stairs, could never climb ladders, ropes, or scaffolds, and should avoid unprotected heights, hazardous machinery, and commercial driving. (Tr. 184, 186). He also opined Plaintiff's symptoms were attributable to a medically determinable impairment and that the severity of her symptoms was partially credible. (Tr. 187). He concluded Plaintiff was capable of working at all exertion levels but had some back pain and controlled seizures. (Tr. 187).

Also on February 25, 2008, state agency psychologist Caroline Lewin, Ph.D., reviewed Plaintiff's file. (Tr. 190). She also concluded Plaintiff had Borderline Intellectual Functioning which did not precisely satisfy the diagnostic requirements of listing 12.05 for Mental Retardation. (Tr. 194). She opined Plaintiff had mild restrictions in her activities of daily living and ability to maintain social functioning. (Tr. 200). She indicated Plaintiff had moderate restrictions in her ability to maintain concentration, persistence, or pace and had no episodes of decompensation. (Tr. 200). In her residual functional capacity ("RFC") assessment, Dr. Lewin opined that Plaintiff was moderately limited in her ability to understand, remember and carry-out detailed instructions, maintain attention and concentration for extended periods, and respond appropriately to changes in the work setting. (Tr. 204-05). In all other areas related to understanding and memory, concentration and persistence, social interaction, and adaptation, Plaintiff was not significantly limited. (Tr. 204-05). Dr. Lewin said Plaintiff could perform

simple, routine tasks in a stable environment that was without constraints of production quotas or stringent time requirements.

On January 8, 2009, state agency psychologist Karen Terry, Ph.D., reviewed the evidence of record on reconsideration. (Tr. 251-68). Dr. Terry also found Plaintiff had Borderline Intellectual Functioning and that this disorder did not precisely satisfy the diagnostic criteria of listing 12.05. (Tr. 259). Her RFC assessment was similar to Dr. Lewin's, however she further concluded that Plaintiff was moderately limited in her ability to interact appropriately with the general public, accept instruction, and respond appropriately to criticism from supervisors. (Tr. 251-52). She indicated Plaintiff remained capable of performing routine work in an environment that is not fast-paced, with limited social interaction, and low stress. (Tr. 253).

On January 12, 2009, Jerry McCloud, M.D., another state agency physician, reviewed Plaintiff's medical record. (Tr. 269-76). He opined Plaintiff did not have any exertional limitations, was not limited in her ability to climb ramps or stairs but could never climb ladders, ropes, or scaffolds, and should avoid unprotected heights, hazardous machinery, and commercial driving because of her seizures. (Tr. 270). Dr. McCloud also opined that Plaintiff was partially credible. (Tr. 274). He noted although Plaintiff claimed her seizure medication made her dizzy and sleepy, Dr. Raheja's record was negative for dizziness and although the medical record showed Plaintiff had reported headaches and back pain, there was no evidence these significantly limited her functioning. (Tr. 274).

On October 29, 2010, Dr. Raheja wrote a letter indicating that Plaintiff was under his care at the neuro clinic for seizures, fibromyalgia, insomnia, and depression and was totally and permanently disabled. (Tr. 377).

*VE Testimony*

Ted Macy, VE, also testified at the hearing. (Tr. 406). The ALJ first asked him about a hypothetical individual with Plaintiff's vocational background who could perform light work but required the option to sit and stand at will, had a limited ability to use the upper right extremity limiting handling and fingering no more than occasionally. (Tr. 406). Further, the work could not involve exposure to unprotected heights or uncovered industrial machinery and the work must be simple, routine, repetitive tasks with easily explainable changes and no production rate work or quotas. (Tr. 406-07). The VE responded that because of the sit/stand option, he would need to look at jobs in the sedentary range and most of those jobs would require frequent use of both hands. (Tr. 407-08). He said he hesitated to assume the limitation in the right extremity would allow Plaintiff to continuously utilize her right hand and therefore concluded there were no jobs that existed in significant numbers for the hypothetical person. (Tr. 408-09). However, he also opined that if he knew the left hand could work continuously there would be many jobs available to such a person. (Tr. 408).

Next, the ALJ asked about a hypothetical person with Plaintiff's vocational background who could do light work with no exposure to fumes, dust or environmental pollutants, no commercial driving, no exposure to hazards, and the work must be limited to simple, routine, repetitive tasks with easily explainable changes not involving production rata or quotas. (Tr. 409). The VE testified that such a person could perform a variety of jobs including work as a bench assembler, wire worker, and final assembler. (Tr. 410).

Lastly, Plaintiff's counsel posed a third hypothetical question, using the same limitations posed by the ALJ in the second hypothetical question but adding that the claimant could only use her dominant right hand for occasional fingering and handling and also had a fifteen percent

7

limitation in maintaining a normal workday or workweek without psychological interruptions. (Tr. 411). The VE opined that being off-task fifteen percent of the time is unacceptable and would require special accommodations. (Tr. 411).

*ALJ's Decision*

On January 21, 2011, the ALJ found Plaintiff had the severe impairments of epilepsy, fibromyalgia, asthma, depression, and cognitive limitations. (Tr. 22). The ALJ then found that Plaintiff's impairments considered singly and in combination did not meet or equal a listing. (Tr. 22). The ALJ found Plaintiff had the RFC to perform light work in that she could lift up to twenty pounds occasionally and ten pounds frequently; could stand/walk or sit for six hours in an eight hour workday; and perform work that did not involve exposure to fumes, dust, environmental pollutants, unprotected heights, or industrial machinery; could not operate a commercial vehicle and required work involving simple, routine, repetitive tasks with easily explainable changes that did not involves production pace or quotas. (Tr. 24). The ALJ then found Plaintiff could do work as a bench assembler, wire worker, and final assembler, thus the ALJ found Plaintiff was not disabled. (Tr. 28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings

8

"as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work

9

in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ (1) erred in finding she did not meet listing 12.05(c); (2) failed to meet her burden at Step 5; and (3) erred in failing to request a medical expert testify at the hearing. (Doc. 20, at 11-16); (Doc. 22, at 8). Each of these arguments will be addressed in turn.

*Listing 12.05 (C)*

To demonstrate intellectual disability, formerly termed mental retardation, a claimant must establish three factors to satisfy the diagnostic description: (1) subaverage intellectual functioning; (2) onset before age twenty-two; and (3) adaptive-skills limitations. *See Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 675 (6th Cir. 2009); *Daniels v. Comm'r of Soc. Sec.*, 70 F. App'x 868, 872 (6th Cir. 2003). Beyond these three factors, a claimant must also satisfy "any one of the four sets of criteria" in listing 12.05. *See Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). Pertinent here, 12.05(C) requires that a claimant have a valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Part 404, Subpt. P, § 12.05(C).

There is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio 2012) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)). However, a reviewing court must find an ALJ's decision contains

"sufficient analysis to allow for meaningful judicial review of the listing impairment decision." *Snoke*, 2012 WL 568986, at *6; *see also May*, 2011 WL 3490186, at *7 ("In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision."). The court may look to the ALJ's decision in its entirety to justify the ALJ's step-three analysis. *Snoke*, 2012 WL 568986, at *6 (citing *Bledsoe*, 165 F. App'x at 411).

The ALJ found Plaintiff did not meet or equal listing 12.05 because she did not have deficits in adaptive functioning. (Tr. 24). Because Plaintiff did not meet the baseline definition under 12.05, the ALJ did not continue on to analyze whether Plaintiff met the criteria under part C of the listing. The ALJ specifically cites Dr. Felker's opinion to support her contention that Plaintiff lacked deficits in adaptive functioning. (Tr. 24).

"The adaptive skills prong evaluates a claimant's effectiveness in areas such as social skills, communication skills, and daily-living skills." *Hayes,* 357 F. App'x at 677. Although Listing 12.05 does not define "adaptive functioning," another portion of the Listings defines "adaptive activities" as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office."20 CFR Pt. 404, Subpt. P, App. 1 § 12.00(C)(1). Furthermore, in considering Listing 12.05 the Sixth Circuit has noted that "[t]he American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments ... in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Id.* (quoting DSM–IV–TR at 49); *Snoke*, 2012 WL 568986, at *7. Thus, if a person is not able to demonstrate significant deficits in areas such as self-care,

communication, cleaning, shopping, and cooking, or otherwise being unable to function independently in terms of daily living, she does not meet the criteria for the listing.

Indeed, Plaintiff's testimony does make it appear that she is unable to function independently. Plaintiff reported only being able to prepare simple microwavable-type meals, only being able to help out with portions of the chores or taking all day to perform certain chores, and needing her mother's assistance to care for her child. (Tr. 389, 392-93, 397). However, in contrast to her testimony, Plaintiff had reported to Dr. Felker that she regularly woke-up, got herself showered and dressed, and then spent the day caring for her son. (Tr. 156). She indicated she was able to do dishes, laundry, and use a computer. (Tr. 155). She did not tell Dr. Felker she required her mother's assistance to do any of these activities. (Tr. 155-56). Dr. Felker indicated that Plaintiff had fair attention and concentration and fair judgment and insight, and had "fairly well developed expressive skills". (Tr. 155-56). This assessment contradicts Plaintiff's testimony about not being able to do things without assistance and further provides evidence that Plaintiff did not have any significant deficits in her adaptive functioning.

Further, both of the state agency psychologists found Plaintiff did not meet the diagnostic criteria of the listing and no medical professional had ever diagnosed Plaintiff with mental retardation, thereby further supporting the ALJ's assessment that Plaintiff did not have the functional impairments necessary to meet the listing. (Tr. 190-205).

Plaintiff argues the ALJ's determination that Plaintiff did not have adaptive deficits prior to age 22 runs in direct conflict with the ALJ's prior decision awarding Plaintiff benefits as a child because she met listing 112.05 which also required the presence of adaptive deficits. (Doc. 22, at 4). However, "[r]ederminations are not a continuing review process, but a one-time event," and a "redetermination provision is to be a fresh evaluation." *Lewis v. Comm'r of Social Sec.*,

12

2011 WL 334850 at *6 (N.D. Ohio) (*citing* 65 FR 54747-1, 2000 WL 3036763). The ALJ was free to make her determination based on the evidence in the record and did not need to consider the prior disability determination.

Plaintiff further argues although she could sometimes perform these activities of daily living and social functioning, substantial evidence did not show she could do them on a sustained basis. (Doc. 20, at 14). However, contrary to Plaintiff's argument, her own reports to Dr. Felker and the fact that no physician had opined Plaintiff had more than moderate limits in activities of daily living, social functioning, and other adaptive functions provides substantial evidence that Plaintiff could perform those activities on a sustained basis. Therefore, the ALJ's finding that Plaintiff did not meet listing 12.05 (C) should be affirmed.

*VE Testimony and RFC Assessment*

Next, Plaintiff asserts the ALJ failed to meet her burden at Step-Five because she did not rely on the hypothetical question to the vocational expert that most closely identified Plaintiff's deficits; but instead relied on a hypothetical that failed to account for her pain, low IQ scores, and depression. (Doc. 20, at 14-16). Because the ALJ's RFC finding adopted the second hypothetical to the vocational expert, Plaintiff is essentially arguing that the RFC is not supported by substantial evidence.

A claimant's RFC is an assessment of "the most he can still do despite his limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. 20 C.F.R. § 416.929. An ALJ must also consider and weigh medical opinions. 20 C.F.R. § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on consideration of the entire record.

13

SSR 96-7p, 1996 WL 374186, *1. The court may not "try the case de novo, nor resolve conflicts in evidence". *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Here, Plaintiff alleges the RFC did not account for her pain, low IQ scores, and depression. (Doc. 20, at 16). However, review of the record indicates the ALJ adequately considered and accounted for these limitations.

With respect to Plaintiff's pain, the ALJ noted she was still able to care for her son, prepare simple meals, and sought only conservative treatment for pain. (Tr. 26, 156). Further, Plaintiff's treating physicians had not indicated any express restrictions for pain management were appropriate. (Tr. 26). Moreover, the ALJ adopted the physical limitations recommended by Drs. Morton and McCloud and even added additional limitations in forming Plaintiff's RFC. *Compare* (Tr. 24) *with* (Tr. 181-89) and (Tr. 269-76).

Similarly, although Plaintiff has a low IQ, the ALJ considered that she had been diagnosed with Borderline Intellectual Functioning, not Mental Retardation. (Tr. 26). Further, he considered the consultative examiner had the impression that this might not have been Plaintiff's best effort. (Tr. 26, 156). Beyond this, none of Plaintiff's treating physicians nor anyone else ever opined that Plaintiff had additional mental limitations specifically due to her IQ.

Likewise, with Plaintiff's depression, the ALJ accommodated for all credible limitations in the RFC by limiting Plaintiff to "work involving simple, routine, repetitive tasks with easily explainable changes and did not involves production pace or quotas." (Tr. 24); *Casey v. Sec'y of H.H.S.,* 987 F.2d 1230, 1235 (6th Cir. 1993) (an ALJ is only required to include limitations he deems credible). This is consistent with the opinion of the state agency psychologists and Plaintiff does not argue that the ALJ's assessment of the state agency psychologists was not

based on substantial evidence. (Tr. 200, 251-52). Therefore, Plaintiff's RFC is supported by substantial evidence and should be affirmed.

*Medical Expert Testimony*

Lastly, Plaintiff argues in her reply brief that the ALJ erred by failing to request a medical expert to testify at the hearing when one was necessary. (Doc. 22 at 8-9).

Under Social Security law, "[t]he burden of providing a . . . record . . . complete and detailed enough to enable the Secretary to make a disability determination [] rests with the claimant." *Landsaw v. Sec. of Health and Human Services*, 803 F.3d 211, 214 (6th Circuit 1986). The ALJ has the "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. § 416.917 ("If your medical sources cannot or will not give us sufficient evidence about your impairment for us to determine whether you are disabled or blind, we *may* ask you to have one or more physical or mental examinations or tests." (emphasis added)).  Additionally, the regulations give an ALJ discretion to determine whether to consult a medical expert. 20 C.F.R. § 416.927(f)(2)(iii) (ALJ "*may* . . . ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment" (emphasis added)). "The primary function of a medical expert is to explain medical terms and the findings in medical reports in more complex cases in terms that the [ALJ], who is not a medical professional, may understand." *Fullen v. Comm'r of Soc. Sec.,* 2010 WL 2789581, *12 (S.D. Ohio) (citing *Richardson v. Perales*, 402 U.S. 389, 408 (1972)).

Plaintiff argues she did not waive this argument by failing to include it in her Brief on the Merits because "much of Plaintiff's Brief reflects why a medical expert was needed". (Doc. 22, at 9). However, contrary to her assertion, at no point in Plaintiff's Brief does she explain why

medical expert testimony was necessary. She generally asserts, in the introductory paragraph of her Brief, that the ALJ relied in error on the state agency physicians and consultative examiners, "because she did not have a medical expert present." Plaintiff does not add to this argument in her Reply Brief, but rather cites to general law indicating, accurately, that an ALJ's role involves acting as a judge, representative of the government, and advisor to the claimant to the extent necessary to ensure a fair hearing. However, she does not explain how the ALJ's failure to have a medical expert testify in any way denied her of a fair hearing or was otherwise in error.

In sum, the burden of establishing a record rests with the claimant. *Landsaw*, 803 F.3d at 214. Here, Plaintiff's counsel was given the opportunity to supply additional records at the hearing but declined to do so. (Tr. 383). The ALJ had discretion to call a medical expert and declined to do so and Plaintiff has not explained how this in any way denied her a fair hearing. *Foster*, 279 F.3d at 355. Therefore, the Court should affirm the ALJ's decision not to call a medical expert.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI benefits applied the correct legal standards and is supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

                                         s/James R. Knepp II
                                         United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).